IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

UNITED STATES OF AMERICA      )
                                       )
                                       )    NO. 3:18-cr-000355-2
v.                                  )
                                       )    JUDGE RICHARDSON
                                       )
NICOLE C. WALKER.          )

## MEMORANDUM OPINION AND ORDER

Pending before the Court is Defendant's renewed Motion for Compassionate Release (Doc. No. 94, "Motion"),[1] whereby Defendant seeks a reduction of her 36-month sentence and immediate release from the custody of the Bureau of Prisons ("BOP"), pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). Like many other federal inmates in this district and around the country, Defendant claims that the ongoing COVID-19 pandemic, as applied to her specific health profile, satisfies the requirement of "extraordinary and compelling reasons" necessary for this Court to grant "compassionate release" under Section 3582(c)(1)(A)(i), and that compassionate release is otherwise appropriate in her case. The Government has filed a response in opposition (Doc. No. 89, "Response"), and a supplement thereto (Doc. No. 97), arguing that the Motion is not yet cognizable by this Court, that Defendant has not shown as required "extraordinary and compelling reasons" for compassionate release or that she is not a danger to the safety of other persons, and

---

[1] A motion under Section 3582(c)(1)(A) is actually a motion for a reduction in sentence, including but not limited to reductions that would result in the defendant-movant's immediate release. The grant of a motion for sentence *reduction* under Section 3582(c)(1)(A) would not necessarily result in the defendant's immediate *release*. *United States v. Maumau*, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *7 (D. Utah Feb. 18, 2020). Nevertheless, such motions generally are known as ones for "compassionate release." *Id.* at n.2 ("In this order, the court uses the phrase 'compassionate release' and 'sentence modification' interchangeably, which is consistent with how other courts have used the terms."); *United States v. McDonald*, No. 94-CR-20256-1, 2020 WL 3166741, at *1 (W.D. Tenn. June 8, 2020). This reflects the fact they typically do seek immediate release rather than a mere reduction in sentence that would result in an earlier release someday but not immediately.

that other applicable considerations counsel strongly against compassionate release. (Doc. No. 69). Defendant has filed a reply (Doc. No. 98, "Reply") in support of the Motion.

<u>PROCEDURAL BACKGROUND</u>

On December 19, 2018, Defendant was charged in all thirteen counts of an indictment filed against her and a co-defendant. (Doc. No. 3). On May 10, 2019, she pled guilty to Count 1, charging conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349, and to Count 8, charging aggravated identity theft, in violation of 18 U.S.C. § 1028A.

Defendant was sentenced on September 30, 2019. At the sentencing hearing, without objection, the Court found the pre-departure guideline range on Count 1 to be 18 to 24 months, to be followed by a consecutive sentence on Count 8 of 24 months—the exact sentence not only called for by the guidelines but also mandated by statute. The Government, however, had moved for a downward departure on Count 1 (without also moving the Court to disregard the mandatory minimum sentence of 24 months on Count 8).[2] The Court granted the motion and in fact departed downward a level more than the Government had requested, departing down to offense level 11 from level 13. This resulted in a post-departure guideline range of 12-18 months, rather than 15-21 months as requested by the Government.

The Court then sentenced Defendant to 12 months' imprisonment on Count 1 and (as required by 18 U.S.C. § 1028A) a consecutive 24-month sentence on Count 8.[3] Accordingly, Defendant received a total sentence of 36 months. The Court ordered the sentence to run concurrent

---

[2] The parties' plea agreement omitted any reference to a potential motion under 18 U.S.C. § 3553(e) asking the Court to sentence on Count 8 without regard to the mandatory minimum sentence; it seems clear that such a motion was not contemplated by the parties as part of the plea bargain.

[3] Notably, as required by 18 U.S.C. § 1028A, the Court was careful not to adjust (in particular, careful not to reduce) its sentence on Count 1, below what it otherwise would have been, based on the fact that Defendant was receiving a 24-month consecutive sentence on Count 8.

with any sentence imposed in an unrelated case, (Rutherford County Criminal Court Docket Number 78729), wherein Defendant had a pending warrant for violation of probation based in part on her commission of the instant federal offenses. (Presentence Investigation Report ("PSR") at ¶ 44).[4] In addition, the Court ordered Defendant, who previously had been on release, to be taken into custody immediately after sentencing.

As of now, Defendant has served only (very nearly) 10 of the 36 months of her sentence. The Court notes that Defendant's sentence to be served would be somewhat less (approximately 30.5) months if she ultimately were to receive full credit for good time served, as the Court does not dispute she is presently on track to do. In terms of percentage of sentence served to date compared to total sentence and sentence with good-time credit factored in, therefore, Defendant is at approximately 27 and 33 percent, respectively.

LEGAL STANDARDS FOR "COMPASSIONATE RELEASE"

Under 18 U.S.C. § 3582(c)(1)(A), as modified by the Section 603(b)(1) First Step Act of 2018, P.L. 115-391, 132 Stat. 5239,[5] the district court may under certain circumstances grant a defendant's motion for compassionate release if what the Court will call the "exhaustion requirements" have been satisfied—*i.e.*, "[either] the defendant has fully exhausted all

---

[4] The PSR, as well as Defendant's medical records cited herein (Doc. No. 91-2, 94-1) were filed, and remain, under seal. The sealing shall be deemed lifted only to the extent that particular information therein has been referred to herein.

[5] That paragraph of Section 603 provides:

(b) INCREASING THE USE AND TRANSPARENCY OF COMPASSIONATE RELEASE.—Section 3582 of title 18, United States Code, is amended—
    (1) in subsection (c)(1)(A), in the matter preceding clause (i), by inserting after ''Bureau of Prisons,'' the following: ''or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier . . .''

administrative rights to appeal a failure of [BOP] to bring a motion [for compassionate release] on the defendant's behalf or [there has been a] lapse of 30 days since the receipt of such a request [for BOP to file such a motion] by the warden of the defendant's facility, whichever is earlier."

Once it properly can act on a motion brought under 18 U.S.C. § 3582(c)(1)(A), the district court can reduce a sentence under that provision (for any defendant younger than 70 years old)[6] only if it finds extraordinary and compelling reasons to do so. *See* 18 U.S.C. § 3582(c)(1)(A)(i). The defendant bears the burden of showing that "extraordinary and compelling reasons" exist to justify release under the statute. *United States v. Hayward*, No. CR 17-20515, 2020 WL 3265358, at *1 (E.D. Mich. June 17, 2020). And the Court does not write on a clean slate in considering what qualifies as "extraordinary and compelling reasons."

Congress tasked the Sentencing Commission with promulgating "general policy statements regarding . . . the appropriate use of . . . the sentence modification provisions set forth in [section] 3582(c) of title 18. . . ." 28 U.S.C. § 994(a)(2)(C). Congress directed the Sentencing Commission, in promulgating these policy statements, to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including criteria to be applied and a list of specific examples." 28 U.S.C. § 994(t). In response to these congressional instructions, the Sentencing Commission promulgated U.S.S.G. § 1B1.13, and its application note, which collectively comprise the policy statement(s).

Practitioners of federal criminal law are accustomed to treating the Sentencing Commission's policy statements as advisory only (especially in the aftermath of *United States v. Booker*, 543 U.S. 220 (2005)). They are exactly that in the context of a defendant's original

---

[6] This subparagraph provides an alternative ground for relief for defendants who are at least 70 years of age. *See* 18 U.S.C. § 3582(c)(1)(A). It is inapplicable here, however, because Defendant is only 41.

sentencing—but not in the context of a motion under Section 3582(c)(1)(A). In the latter context, they are by statute mandatory, inasmuch as Congress has prohibited courts from granting a sentencing reduction unless "such a reduction is consistent with applicable policy statements issued by" the Sentencing Commission. 18 U.S.C. § 3582(c)(1)(A).[7]

Together, U.S.S.G. § 1B1.13 and its application note do two things that are relevant here. First, they define, in Application Note 1, "extraordinary and compelling circumstances" to apply in (and only in) situations falling within one or more of five separate and particular categories, which the Court discusses below. *See* U.S.S.G. § 1B1.13 n.1(A)(i)-(ii), (B), (C) & (D).[8] Second, they prescribe additional requirements for obtaining a sentence reduction where the defendant does meet the threshold requirement of "extraordinary and compelling circumstances."[9] Specifically, for a defendant not yet 70 years old (such as Defendant), the court may reduce a sentence if (1) extraordinary and compelling reasons warrant a reduction, *and* (2) the defendant is not a danger to the safety of any other person or to the community, *and* (3) the reduction is consistent with the policy statement. *See* U.S.S.G. § 1B1.13(1)(A), (2) and (3). The Application Note indicates the third requirement may be redundant of the first two, inasmuch as it states that "any reduction made . . . for the reasons set forth in subdivisions (1) and (2) [*i.e.*, U.S.S.G. § 1B1.13(1) & (2)] is

---

[7] In *Booker*, the Supreme Court found unconstitutional (*i.e.*, violative of the Sixth Amendment) Congress's directive that the Sentencing Guidelines are generally what was referred to as "mandatory," meaning that sentence generally had to be imposed within the guideline range calculated using the Sentencing Guidelines. To say the least, this limited Congress's ability to make anything about the Sentencing Guidelines mandatory in the context of an original sentencing. But such limitations do not exists in the context of a motion for sentence reduction under Section 3582(c)(1)(A), wherein the Sixth Amendment concerns driving the *Booker* decision are entirely absent.

[8] The Application Note also contains various other instructions for considering whether extraordinary and compelling circumstances exist. Such instructions need not be discussed here, as the Court herein resolves the Motion without any need to refer to them.

[9] It is important to note that these other requirements—being, after all, *requirements*—are mandatory. That is to say, a defendant is *not* eligible for compassionate release merely because there are "extraordinary and compelling reasons" within the meaning of Application Note 1(A).

consistent with this policy statement." *Id.* at n.5.[10]

If the court does find these (two or three depending on how one looks at it) requirements satisfied, the defendant has met the basic eligibility for compassionate release. But even then, the Court does not automatically or necessarily grant the motion for a reduction; instead, it *may*, after considering the factors set forth in 18 U.S.C. § 3553(a), reduce the term of imprisonment (and may impose a term of probation or supervised release that does not exceed the unserved portion of the original term of imprisonment). *See* 18 U.S.C. § 3582(c)(1)(A).

The (familiar) sentencing factors set forth in Section 3553(a) include:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>> (B) to afford adequate deterrence to criminal conduct;
>> (C) to protect the public from further crimes of the defendant; and
>> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
>
> (3) the kinds of sentences available;
>
> (4) the kinds of sentence and the sentencing range established for—
>> (A) the applicable category of offense committed by the applicable category of defendant as set forth in the . . .
>>> i) [United States Sentencing Guidelines, ("U.S.S.G.")]—
>>> ii) [in effect at the time of sentencing]
>
> (5) any pertinent policy statement—
>> A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code; and
>> B) [and in effect at the time of sentencing]

---

[10] Like many redundancies, this one may seem odd due to its apparent unnecessariness. But it seems motivated by the valid desire to ensure that the Sentencing Commission's criteria for a sentencing reduction expressly both: (a) included the congressional requirement, discussed below, that any reduction be "consistent with applicable policy statements issued by" the Sentencing Commission; and (b) clarified that the required consistency involved nothing more than satisfaction of U.S.S.G. § 1B1.13(1) & (2).

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a).

Relevant to factor number (5), as discussed above, the Sentencing Commission has issued a binding policy statement regarding reduction of a term of imprisonment under Section 3582(c)(1)(A). *See* U.S.S.G. § 1B1.13. As further mentioned above, Application Note 1 to U.S.S.G. § 1B1.13 speaks to what constitutes "extraordinary and compelling reasons," identifying five categories of situations where such reasons may be found to exist. Two of the five involve the defendant's medical condition, *i.e.*: (i) the defendant is suffering from a terminal illness; or (ii) the defendant is suffering from a serious physical or medical condition, or serious functional or cognitive impairment, or deteriorating physical or mental health due to the ageing process, that substantially diminishes the defendant's ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover. *See* U.S.S.G. § 1B1.13 n.1(A). The next two categories relate to defendants over 65 and defendants with particular grave family circumstances, respectively; they are not applicable to the instant Motion.

As for the last of the five categories (sometimes referred to as the "residual" or "catchall" provision), the Application Note describes it as encompassing the situation where, "*[a]s determined by the Director of the Bureau of Prisons*, there exists in the defendant's case an extraordinary and compelling reason *other* than, or in combination with, the reasons described in subdivisions (A) through (C)." U.S.S.G. § 1B1.13 n.1(D) (emphasis added).

In the Motion, Defendant relies on the prevailing COVID-19 pandemic and her medical condition. As Defendant describes it, she "suffer[s] from numerous health conditions, including congestive heart failure, uncontrolled hypertension and kidney problems (renal failure), that place her at high risk of serious of contracting and suffering serious complications from Covid-19 in the close confines of the Bureau of Prisons." (Doc. No. 94 at 1). As a result, she claims, she has shown "extraordinary and compelling reasons" for her compassionate release under Application Note 1(A)(ii)(I), because (she says) she is "'suffering from [] serious physical or medical condition[s]' from which she will not recover, and those conditions 'substantially diminish[]' her ability to provide self-care." (*Id.* at 6 (quoting U.S.S.G. § 1B1.13, appl. n. 1(A)(ii))). She claims, alternatively, that she has shown "extraordinary and compelling reasons" under the catchall provision. (*Id.* at 9-11). She also claims that the Section 3553(a) factors counsel in favor of her compassionate release. (*Id.* at 12-13). In so arguing, she touches on several circumstances (the non-violent nature of her offenses of conviction, her allegedly sound release plan, and her cooperation, compliance and alleged rehabilitation since committing the instant offenses of conviction) that might support a finding that she does not pose a danger. In the Motion, Defendant did not explicitly refer to the existence (or her satisfaction) of the requirement that she is not a danger to the safety of any other person or to the community, although she did do so in her Reply.

The Government argues in response that Defendant has not shown either satisfaction of the exhaustion requirement or "extraordinary and compelling reasons" as required for compassionate release. (Doc. No. 89 at 5-6, 6-12). The Government also correctly notes that under U.S.S.G. § 1B1.13(2), "this Court must deny a sentence reduction unless it determines the defendant 'is not a danger to the safety of any other person or to the community.'" (*Id.* at 13 (quoting U.S.S.G. §

1B1.13(2))). In the Government's view, this determination cannot be made as to Defendant. (*Id.* at 13-14) The Government further suggests that even if such determination could be made, the Motion should be denied because the factors under Section 3553(a) militate against granting the Motion. (*Id.* at 12-13).

ANALYSIS

The stage is thus set for the Court to decide the Motion. The Court will address the applicable issues in turn: (a) whether Defendant has satisfied the exhaustion requirements, such that the Motion is in fact cognizable by this Court; and, if so, (b) whether Defendant is eligible— or, more precisely, eligible to be further considered—for compassionate release due to alleged existence of "extraordinary and compelling reasons," and if so, (c) whether Defendant is further eligible to be considered because she would not pose a danger to other persons or the community if released; and, if so, (d) whether, upon further consideration (*i.e.*, consideration of the factors set forth in 18 U.S.C. § 3553(a)), the Motion should be granted.

As discussed below, the Court: (a) answers the first question in the affirmative; (b) answers the second question in the affirmative, (c) answers the third question in the negative; and (d) answers the fourth question in the negative, assuming *arguendo* it needed to be reached. Because the negative answer to the third question, or alternatively the negative answer to the fourth question (if reached), necessitates denial of the Motion, the Court will deny the Motion.

## I.      EXHAUSTION REQUIREMENTS

In an opinion issued three months ago, the undersigned concluded that a district court cannot disregard the exhaustion requirements of 18 U.S.C. § 3582(c)(1)(A)(i). *See United States v. Edwards*, No. 3:13-CR-00012-1, 2020 WL 1987288, at *11 (M.D. Tenn. Apr. 27, 2020). And in an opinion issued thereafter, the Sixth Circuit confirmed that a district court may not disregard

the exhaustion requirement. *See United States v. Alam*, -- F. App'x --, No. 20-1298, 2020 WL 2845694 (6th Cir. June 2, 2020). Accordingly, any request for compassionate release made to a district court is premature until a "defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A)(i).

In an order dated June 16, 2020 (Doc. No. 93), the Court denied without prejudice Defendant's original motion seeking compassionate release, (Doc. No. 87),[11] on the grounds that Defendant had failed to show satisfaction of the exhaustion requirements. Thereafter, Defendant filed the Motion, which contained, among other things additional indicia that she had satisfied the exhaustion requirements. The Government maintains, however, that Defendant still has not shown satisfaction of the exhaustion requirements.

After reviewing multiple briefs and attachments thereto, the Court concludes that in asserting her satisfaction of the exhaustion requirements, Defendant at this point relies exclusively on a pair of "Inmate Request to Staff" forms dated April 20 and April 23, 2020, respectively. (Doc. No. 94-3 at 2-3).

The Government does not contest the sufficiency of either of these requests. Instead, it effectively questions whether the requests were actually received by BOP, which (according to the Government) has asserted that it has no record of receiving these requests. (Doc. No. 97 at 1). Defendant, unsurprisingly, notes that BOP perhaps could be unable to find such a record even if it had in fact earlier received these requests. In any event, under the circumstances, the Court would be hard-pressed to conclude that BOP has in substance, if not in form "received" these requests,

---

[11] The Government's Response (Doc. No. 89) to the original motion, being equally responsive to the instant Motion, is serving as its primary response (in opposition) to the Motion.

since by now the Government surely has made BOP quite aware of them and did so more than 30 days ago. Thus, the Court deems the exhaustion requirements satisfied, and the Court thus may consider the Motion.

II.    EXTRAORDINARY AND COMPELLING REASONS

In addressing the merits, the Court first must determine whether "extraordinary and compelling reasons" exist for Defendant's compassionate release under the standards set forth by U.S.S.G. § 1B1.13 and its application note. Defendant bears the burden to show that extraordinary and compelling reasons exist warranting her release. *United States v. Shabudin*, No. 11-CR-00664-JSW-1, --- F. Supp. 3d ----, 2020 WL 2464751, at *3 (N.D. Cal. May 12, 2020); *United States v. Crouch*, No. 5:19-CR-00029-TBR, 2020 WL 1963781, at *3 (W.D. Ky. Apr. 23, 2020) ("[Defendant's] circumstances do not meet the burden of extraordinary and compelling.").

In the instant case, Defendant relies upon the above-referenced medical conditions that she claims, when combined with the COVID-19 pandemic, constitute extraordinary and compelling reason. Such assertions, as often is the case on compassionate release motions, asks the Court to put itself in the difficult position of making medical assessments it is simply not qualified to make.

As it happens, however, in the Court's experience defendants and the Government alike tend to refer (and defer) to the views of the Centers for Disease Control and Prevention ("CDC") when making their arguments for "extraordinary and compelling reasons" within the meaning of Application Note 1(A). More specifically, typically the Government concedes that if the defendant suffers from a condition that is "chronic," and if the CDC says that the particular chronic condition is one that places those suffering from it at a higher risk from COVID-19, the Government concedes that there are "extraordinary and compelling circumstances" such that the primary requirement for compassionate release is satisfied. And typically, the moving defendant effectively

agrees that the question of whether this requirement is satisfied should be answered by reference to the CDC's view on whether the defendant's condition places him or her at a higher risk from COVID-19. Typically, neither side makes more than a minimal (if any) reference to the views of anyone else regarding the relationship between COVID-19 and the defendant's (alleged) medical conditions

Such is the case here. The parties make their respective arguments as to Defendant's satisfaction of the requirement to show "extraordinary and compelling reasons" by reference to whether any of her conditions are identified by the CDC as elevating the sufferer's risk from COVID-19. This is the parties' choice, and it is a reasonable one, even though it is far from the only possible way for the parties (or the Court) to look at the issue. The Court will acquiesce in the parties' mutual approach and will conduct its analysis accordingly, addressing only the CDC's views as to Defendant's asserted medical conditions.

Defendant relies on the fact that she has some form of heart disease. The Government concedes this fact. (Doc. No. 89 at 9). As the Government correctly notes, the CDC has stated that "serious heart conditions," including "heart failure," puts a sufferer at higher risk from COVID-19. (Doc. No. 89 at 9). However, the Government says that "nothing indicates" that Defendant's "heart disease" falls into one of the specified "serious heart conditions" recognized by the CDC to raise a sufferer's risk. This is not accurate. As the PSR in this case noted, medical records from Vine Hill Community Clinic show a diagnosis of "congestive heart failure of unknown etiology." (PSR at ¶ 66). The Court is hesitant to rely too heavily on a brief reference to a diagnosis from a single clinic, especially when other records indicate a lack of evidence to support the diagnosis. (Doc. No. 91-2 at 67). However, the diagnosis of congestive heart failure is perfectly consistent with (even though not confirmed by) the undisputed diagnosis of *some* form of heart disease.

Because Defendant has shown that she has been credibly (if debatably) diagnosed with a condition on the CDC's list of serious medical conditions raising risk from COVID-19, the Court finds on balance that she has shown "extraordinary and compelling reasons."[12]

### III. DANGER TO THE SAFETY OF ANY OTHER PERSON OR THE COMMUNITY

As noted above, Defendant can be eligible for compassionate release, such that the Court proceeds to an analysis of the factors under 18 U.S.C. § 3553(a), only if she is not a danger to other persons or the community. *See* U.S.S.G. § 1B1.13. The Court generally perceives the precise issue to be whether Defendant would pose such a danger *if released* (and not whether she currently poses a danger while incarcerated). "[T]he defendant has the burden of proof on the issue of his lack of danger to others and the community." *See United States v. Rodriguez*, No. 3:95CR772, 2020 WL 3260711, at *1 (N.D. Ohio June 13, 2020). The Court finds that Defendant has not met that burden.

As noted above, in discussing the Section 3553(a) factors in the Motion, Defendant has asserted circumstances (or alleged circumstances) implying that she is not such a danger, (Doc. No. 94 at 12-13), but prior to her Reply she did not exactly address, or explain why she meets, her specific burden on this issue. But from the Reply and the Motion, the Court discerns clearly Defendants argument on this point.

The gist is that Defendant contends she has shown she would not pose a danger if released, primarily because: her instant crimes were non-violent; when confronted about them by law enforcement, she promptly confessed and cooperated; after being arrested for them, she complied with conditions of pretrial release without issues for nine months prior to going into custody; and

---

[12] For this reason, it is unnecessary for the Court to address Defendant's claims that she has shown "extraordinary and compelling reasons" under the catchall provision or that (contrary to what the undersigned has held previously), she may invoke the catchall provision even though the Director of BOP has not identified in Defendant's case any such "other" reasons contemplated by the catchall provisions.

she is a "good and loving mother," Defendant appears to imply that the danger she would pose if released is reduced by the fact that she is motivated to keep out of trouble so that she can care for her children. Defendant also suggests that her proposed release plan reduces the danger she would pose because it holds out the promise of family stability (by her residing with her son and son's father) and employment.

Although Defendant has pointed to various circumstances that do weigh in her favor, on balance the Court finds that Defendant has not met her burden as to lack of dangerousness. The Court does not presume this merely because Defendant is currently incarcerated for a serious (though non-violent) offense. The inquiry is more comprehensive than that, involving most significantly a review of Defendant's entire criminal history. As the Government accurately puts it:

> [Defendant's] respect for the laws, even while under supervision, remains questionable. At sentencing, this Court determined [Defendant] had six criminal history points, establishing a Criminal History Category of III. (PSR, ¶ 47.) The defendant was convicted in 2017 of state identity theft crimes, and initially received a sentence of two years probation. (PSR, ¶ 44.) In 2018, she violated probation by testing positive for hydrocodone, hydromorphone, methamphetamines, and marijuana. (PSR, ¶ 44.) During that same period, [Defendant] committed the fraud and aggravated identity theft crimes at issue in this case.

> [Defendant] has not been a perfect inmate at FPC Alderson. She was disciplined on May 11, 2020 after being caught in the cell of another inmate. (Ex. 4, BOP Disciplinary Record.) A violation of this nature takes on increased significance in the age of COVID-19, especially at detention centers and prison camps.

> . . .

> This Court was presumably concerned about [Defendant's] potential for recidivism when it imposed at sentencing the occupation restriction prohibiting her from working in any business where she has access to means of identification. (D.E. 84, Judgment.) If released now, [Defendant's] job prospects are bleak, due to the occupational restriction and Coronavirus. As noted earlier, the BOP determined that [Defendant] has a history of violence. This concern may stem from the 2018 order of protection issued against the defendant for threatening to kill an ex-boyfriend.

(Doc. No. 89 at 12-13).

Even setting aside the five sentences imposed on Defendant more than a decade ago, Defendant had been sentenced in four different case (two involving felony convictions) in the four years preceding the filing of the indictment in this case, and she violated probation imposed in two of those four sentences. So even though Defendant's most recent history of compliance (though not 100 percent perfect) is good as far as the record shows, her recent history as a whole is poor. Moreover, the Government rightly focuses on Defendant's failure to comply with conditions of release; this characteristic is crucial because it is precisely the absence of compliance with conditions of release that eviscerates the protections put in place to protect society against the danger presented by Defendant. And although many of her convictions (and two additional violations of probation) are old, beginning in 2014 there has been a distinct pattern of criminality that continued unabated until she was arrested in connection with this case on December 28, 2018.

Given her recidivism as to significant crimes and her history of non-compliance with conditions of release, the Court cannot conclude that Defendant would not be a danger to other persons or the community if released. To prevail on this issue, Defendant needs a good (or at least not poor) record in this regard. And, unfortunately, Defendant's record was poor indeed until all too recently.

None of this is to diminish the significance of Defendant's recent apparent compliance and cooperation efforts (and successes) after being confronted with her crimes in this case. These are commendable and well may be, or have been, rewarded in other ways: the above-referenced downward departure; personal growth and fulfillment; earning maximum credit for good time served; and earning certain inmate privileges not extended to all inmates. But the Court cannot say that these recent developments suggest that the demonstrated danger she has posed to other persons

for a number of years has disappeared and would not manifest itself again if Defendant were released.

It is also significant that Defendant's release plan, despite its purported promise of positive developments in Defendant's life, does not suggest that it would adequately reduce Defendant's risk of danger to others or the community. Whatever positive influence may be imparted by her relationship with her son and her son's father, it has failed even in recent years to prevent recidivism. As for her proposed employment as a home health aide, the Court agrees with the Government that it does not square easily with either the special condition of supervised release posing an occupational restriction nor the very idea of granting her compassionate release, *i.e.*, minimizing her exposure to COVID-19 via social distancing.[13]

Ultimately, the circumstances to which Defendant points are not enough, in light of countervailing circumstances, for the Court to say that Defendant has met her burden to show that she would not be a danger if released.[14]

IV.   SECTION 3553(a) FACTORS

Although Defendant does not qualify for compassionate release, irrespective of how the Section 3553(a) factors apply to her, the Court will discuss the most salient Section 3553(a) factors, which collectively cut against granting compassionate release for her.

*Th nature and circumstances of the offense* cut against compassionate release for two reasons. First, the instant offenses of conviction (which spanned from approximately March 2018

---

[13] "The defendant is barred from engaging in any occupation, business, or profession in which she has access to means of identification, without the prior approval of the U.S. Probation Office." (Doc. No. 84 at 5).

[14] It is not lost on the Court that whether someone is a "danger" within the meaning of U.S.S.G. § 1B1.13 in relatively close cases like this one may be in the eye of the beholder. The notion of a "danger" is not entirely ambiguous and somewhat subjective, with the line between being and not being such a danger being somewhat blurry. But as the beholder called upon to make the determination in this case, the undersigned cannot find that Defendant is not a danger.

through June 2018) reflect a still-recent and disturbing recidivism as to identity theft, for which she had been sentenced (under state law) in December 2017.[15] Second, one of her crimes (aggravated identity theft in violation of 18 U.S.C. § 1028A) is subject to a mandatory two-year consecutive sentence (regardless of criminal history). This means, as discussed further below, that compassionate release would result in a substantial sentencing disparity between her and others who, like her, are convicted of violating 18 U.S.C. § 1028A and are not eligible for relief pursuant to 18 U.S.C. §1028A from the mandatory minimum sentence.

*The history and characteristics of the Defendant.* As suggested above, Defendant's criminal history and recidivism cuts against compassionate release. This is offset, but only somewhat, by more recent apparent compliance on her part.

For the same reason and to the same extent, and for the reasons discussed above in connection with whether Defendant would be a danger if released, *the need to protect the public from further crimes of the defendant* also cuts against Defendant.

*The need to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner* likewise does not cut in favor of compassionate release for Defendant. The focus in this case plainly is on the need for medical care. Typically, in original sentencings, the "need to provide the defendant . . . with needed medical care" relates to the Court's recommendations to BOP as to what medical treatment should be considered and where the sentence should be served. In the instant context, though, it is fairly construed to refer more generally to the need to assess whether Defendant's medical condition can be adequately safeguarded in a BOP facility. Defendant claims that the answer is no, pointing to the risk of COVID-19 infection at the facility where she is incarcerated (FPC Alderson) and to her

---

[15] Defendant was sentenced to two years' custody, but the sentence was suspended, and she was placed on probation; while on probation, she committed the instant offenses. (PSR at ¶ 44).

medical condition, which she says renders her especially vulnerable to bad outcomes should she become infected.

The Court will not act like it knows the extent to which Defendant's chances of infection would be lower if she is released than if she stays in BOP custody, or how much more likely a bad outcome upon infection would be for her as opposed to someone with a more typical medical profile. As matter of sheer epistemology, the undersigned cannot and does not know such things; this is true despite publicly available information from medical experts and public health officials, inasmuch as they do not always agree with one another on issues related to COVID-19 and inasmuch as some seem to have reversed themselves on various issues over time.[16] In short, information and opinions regarding the prevalence of, effect of, and optimal countermeasures to COVID-19 have been in constant flux, and it would be folly for the Court to rely blindly on any particular opinion or factual assertion merely because it comes from a purportedly knowledgeable or reputable source.

Having said that, the Court is willing to accept that Defendant is at substantial risk of COVID-19 infection at FPC Alderson, even though no outbreak has yet occurred there, as far as the record reflects. The Court is also willing to accept that Defendant's medical conditions make her prone to relatively bad outcomes in case of infection. This stance is, of course, consistent with the Court's finding above that there exist "extraordinary and compelling reasons" within the meaning of U.S.S.G. § 1B1.13.

---

[16] It seems clear to the undersigned that certain public health authorities, public health officials, and other public officials over time have equivocated regarding, or even starkly changed, their views concerning one or more of numerous issues, including but not limited to: whether COVID-19 can be transmitted person to person; whether persons should avoid crowds and/or otherwise alter their daily regimen due to the presence of COVID-19 in the United States; the likely death toll and mortality rate from COVID-19; whether masks/face coverings should be worn; and the extent to which COVID-19 may be transmitted via contact with inanimate surfaces.

But that does not mean that these circumstances ultimately support compassionate release. For one thing, the Court would merely be speculating as to the extent of the risk of infection at USP Alderson and as to the likelihood of a bad outcome upon infection. For another thing, to say the least, it is not like there in no substantial risk of infection outside of BOP custody. For example, the Tennessee Department of Health reports, in Davidson County, Tennessee (where Defendant proposes to reside if released), 18,377 "confirmed or probable" and 5189 "active" cases of COVID-19 as of July 28, 2020. *See Epidemiology and Surveillance Data*, Tennessee Dept. of Health, https://www.tn.gov/content/tn/health/cedep/ncov/data.html (last accessed June 29, 2020). And as is also a matter of public record (and undeniable truth in the undersigned's personal experience), these cases have accrued despite substantial steps to keep the infection rate down in Davidson County.

Given Defendant's history of criminal activity and noncompliance with conditions of release (probation), Defendant has demonstrated an unwillingness and/or inability to comply with rules and societal norms in at least some important respects. This is vital, because under her own theory (and the widely-accepted view worldwide), decreasing his risk of infection upon release from BOP custody would require her to observe public/health and societal norms related to COVID-19, such as handwashing and social distancing. And although the Court does not know the details of Defendant's one disciplinary infraction in BOP custody (being caught in the cell of another inmate long after the COVID-19 pandemic had hit the country) or what she knew about COVID-19 countermeasures at the time, this infraction certainly does not help convince the Court that Defendant is particularly committed to social distancing.

Defendant's history, though recently improved, unfortunately indicates a questionable likelihood of following crucial rules or norms even where so doing is to the benefit of herself.

Defendant does not present a demonstrably safe bet of complying with the relevant standards or with the conditions of home confinement that would further reduce her risk of infection.

Defendant also has failed to show that she actually, not just theoretically, will fare better outside of BOP custody if she were to be infected with COVID-19. For example, the Court cannot conclude she would receive better medical care to combat a COVID-19 infection outside of BOP custody. As for Defendant's underling medical conditions upon which she relies, likewise, the Court cannot conclude that they would be better managed outside of BOP custody.

For all of these reasons, there is no good basis to believe that Defendant's release is likely *in actuality*—not just theory—to substantially reduce her risk from COVID-19.

*The sentencing guidelines* do not support compassionate release. Defendant was sentenced at the bottom of the post-departure (advisory) guideline range. As noted above, the revised sentence requested by Defendant would amount to just 27 or 33 percent (depending on whether good-time credit is factored in) of that guideline sentence.

*The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct* also cuts against Defendant. The sentence Defendant now seeks would result in a disparately low sentence compared to defendants convicted of similar conduct with similar criminal history. As noted above, Defendant has served roughly 10 months, approximately 27 or 33 percent (depending on whether good-time credit is considered) of her sentence of 36 months. This fact may weigh against her release. *See United States v. Kincaid*, -- F. App'x --, 2020 WL 2521303, at *1-2 (6th Cir. May 18, 2020) (holding that it is appropriate for district courts to consider the percentage of the overall sentence left to be served when addressing compassionate release motions). Moreover, there is a clear and certain disparity between Defendant and other defendants—of all criminal records, including ones similar to

Defendant's—convicted of one of her two counts of conviction (18 U.S.C. § 1028A) without relief

under 18 U.S.C. § 3553(e): if released today, Defendant would have served slightly less than half

of the 24-month sentence (even if it is reduced by full credit for good-time served) other defendants

must serve. This would be a not insignificant disparity, even if Defendant did not have an

additional 12-month sentence on her other count of conviction. Even if Defendant's sentence

reduction could be deemed "warranted" based on "extraordinary and compelling reasons" arising

from her health profile—which is debatable absent a sound current basis to believe that Defendant

would fare better on release living in Davidson County—it arguably would be *unwarranted* for

healthy similarly situated inmates to serve at least twice as long as Defendant merely because

(perhaps to their great credit)[17] they are healthy. For these reasons, the Court finds that this factor

ultimately does not weigh in favor of granting compassionate release.

CONCLUSION

Compassionate release is an extraordinary remedy. *See*, *e.g.*, *United States v. Rizzo*, No.

CR 16-20732, 2020 WL 2092648, at *3 (E.D. Mich. May 1, 2020). Such remedy is unavailable

here, given that if released, Defendant has not shown that she would not present a danger to other

persons or the community. Alternatively, even if compassionate release were potentially available,

it would be inappropriate, considering the Section 3553(a) factors.

For these reasons, the Motion (Doc. No. 94) is **DENIED**.

---

[17] It seems undeniable that there is a connection between good health and laudable, prudent lifestyle choices. Thus, such good choices can help explain the relative good health even of individuals who have made poor choices in different spheres that have landed them in prison. Notably, the Court does not mean to imply here in any way that Defendant's health issues are a result of any choices she has made or is her fault in any way.

IT IS SO ORDERED.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE